**MANLOADING & MANAGEMENT ASSOCIATES, INC.**

v.

**The UNITED STATES.**

No. 48–71.

United States Court of Claims.

June 16, 1972.

**1300**

William H. Pattison, Jr., Bethesda, Md., attorney of record, for plaintiff.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

COWEN, Chief Judge:

This contract case is before the court on the parties' cross-motions for summary judgment. The material facts are not in dispute. On April 8, 1970, the Department of Housing & Urban Development (HUD) solicited bids on a contract for the conversion of approximately 3,000,000 Federal Housing Administration home mortgage records to a magnetic tape storage and retrieval system.

The Government knew that it would take two years to complete the contract and that very little of the work could be completed by the end of the fiscal year in which the contract would be awarded. However, because renewals of the contract would be subject to the availability of funds appropriated for that purpose, the invitation for bids contained the following provision, which became a part of the contract:

III. PRODUCTION REQUIREMENTS AND PERIOD OF PERFORMANCE

A. The Government anticipates that the work to be performed under this contract cannot be completed until Fiscal Year 1972. However, because of fiscal year limitations on funds, the contract to be awarded under this solicitation covers work to be performed through June 30, 1970.

B. This contract is renewable, at the option of the Government, by the Contracting Officer giving written notice of renewal to the Contractor, as specified below. If the Government exercises this option for renewal, the unit price shall be the same as in the initial procurement and the contract as renewed shall be deemed to include this option provision. However, the total duration of this contract, including the exercise of any options under this clause, shall not extend beyond June 30, 1972.

\* \* \* \* \* \*

In the latter part of April 1970, prior to the submission of bids, HUD held a pre-award bidders' conference which was attended by plaintiff and other prospective bidders. The contracting officer designated S. J. Scala as the Government's representative at the conference. In light of the option clause, *supra,* and because the solicitation for bids was made on April 8, 1970, with the current fiscal year about to expire in June 1970, the prospective bidders at the conference were quite concerned about bidding on a project contemplated to be completed in fiscal year 1972. According to the uncontroverted affidavit of the president of plaintiff corporation, who personally attended the conference:

> * * * Mr. Scala, in response to a direct question inquiring as to the meaning and the intent of the option provisions of Sub-paragraph B under Section III, Production Requirements and Period of Performance, of the subject invitation to bid, advised those prospective bidders present that it was intended to afford the Government an option to terminate the agreement at the conclusion of any fiscal year subsequent to the letting of the contract in the event that funds were not appropriated to permit completion of the contract, *but that any prospective bidder should be assured that funds were available and that there would be no question about the renewal of the contract for the fiscal year beginning July 1, 1970.* [Emphasis supplied.]

Relying on Mr. Scala's assurance that the contract would be renewed and would continue at least for the next fiscal year beginning in July 1970, plaintiff prepared and submitted its bid. A total of 12 bids were received and opened by the Government on April 29, 1970. Network Information Systems, Inc., was the lowest bidder, followed by plaintiff. On May 14, 1970, the contracting officer notified Network that its bid had been rejected as "unreasonably low and nonresponsive" and consequently the contract was awarded to plaintiff on the same date. Plaintiff immediately began to recruit and train personnel and to purchase supplies and material for the performance of the contract. By June 30, 1970, plaintiff had incurred substantial expense and had completed a portion of the contract.

Network protested its loss of the award and this resulted in a decision rendered by the Comptroller General. Comp. Gen. B–169824 (June 26, 1970) (unpublished). The Comptroller General, believing that the specifications were ambiguous, recommended that HUD not exercise its option to renew plaintiff's contract for the next fiscal year, but instead, that HUD reprocure under revised specifications. This was done and new bids on a substantially identical contract were solicited on July 8, 1970. The new contract was awarded to Network, which again was the lowest bidder.

Following the award to Network, plaintiff brought suit in this court alleging that the Government breached its obligation to renew the contract for the next fiscal year beginning in July 1970. In short, plaintiff contends that it is entitled to rely on what it was told at the bidders' conference, i. e., "that there would be no question about the renewal of the contract for the fiscal year beginning July 1, 1970".

Defendant contends that the language of the option clause, *supra,* gives the Government an unrestricted right to renew. Defendant does not deny plaintiff's statement of what took place at the bidders' conference, but characterizes the episode as pre-contract negotiations which are not binding on the Government because they were not incorporated into the written contract. Specifically, defendant relies in part on the following exculpatory language found in the solicitation:

> VII. CONDITIONS AFFECTING THE WORK
>
> Bidders should visit the site and take such other steps as may be

reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Failure to do so will not relieve bidders from responsibility for estimating properly the difficulty or cost of successfully performing the work. *The Government will assume no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of the contract, unless included in the invitation for bids, the specifications, or related documents.* \* \* \* [Emphasis supplied.]

Defendant asserts that the italicized portion of the language quoted above absolves the Government of the statements made by Mr. Scala at the bidders' conference. We disagree. Taken by itself, the italicized language appears to exculpate the Government. However, when examined in context, it is apparent that the pertinent language is not applicable to the factual setting before us. Clearly, the exculpatory language is meant to apply only to representations concerning "the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof."

■ Similarly, defendant relies on the Solicitation Instructions and Conditions document in the invitation, which reads:

3. EXPLANATION TO OFFERORS. Any explanation desired by an offeror regarding the meaning or interpretation of the solicitation, drawings, specifications, etc., must be requested in writing and with sufficient time allowed for a reply to reach offerors before the submission of their offers. *Oral explanations or instructions given before the award of the contract will not be binding.* Any information given to a prospective offeror concerning a so-

licitation will be furnished to all prospective offerors as an amendment of the solicitation, if such information is necessary to offerors in submiting offers on the solicitation or if the lack of such information would be prejudicial to uninformed offerors. [Emphasis supplied.]

Again, the italicized language appears to negate the Government's liability. However, when considered in context we think that this language also does not apply to Mr. Scala's statements. Rather, we think that the clause should be construed in accordance with its obvious purpose, which is to ensure that relevant information be afforded equally to prospective offerors. The clause speaks of requests made individually by a prospective bidder and provides that any explanation given him must be furnished to all other bidders. Thus, we do not believe it was designed to apply to a pre-bid conference where typically all of the prospective bidders are present and oral questions and answers are expected and encouraged. That was the situation here. Bids were restricted to bidders whose place of business was within a 25-mile radius of the United States Capitol Building, and plaintiff's affidavit shows that representatives of the other prospective bidders were present.

■ It was the Government's intention, as well as the understanding of the plaintiff, that the successful bidder would be required to provide the personnel and supplies necessary to perform a contract extending over more than a 2-year period. From the standpoint of the prospective bidders, the question of most vital importance to them was the renewal of the contract after the expiration of the less than 2-month period that would remain before the end of the current fiscal year in which the contract was to be awarded. The purpose of the bidding conference was to provide the bidders with the information which they needed to submit a responsive bid under the unusual circumstances described. Mr. Scala was fully authorized to provide such information, and it is undisputed that

plaintiff relied on it to its detriment. It was obvious that the successful bidder would have to incur a considerable amount of preparatory costs in order to start performance of the contract. Since the question of renewal was of such paramount importance to the prospective bidders, it cannot be doubted that Mr. Scala intended for them to rely upon his statement. At the time the statement was made, the Government was acting in a proprietary capacity, and there is no indication that Mr. Scala's representations had the effect of nullifying a statutory requirement. Under all the circumstances, we think this is an appropriate case for applying the doctrine of equitable estoppel which, in effect, results in an amendment that renewed the contract as of July 1, 1970, for the next fiscal year. Branch Banking & Trust Co. v. United States, 98 F. Supp. 757, 120 Ct.Cl. 72 (1951), cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L. Ed. 699 (1951); United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970).

The court was recently confronted with a somewhat similar factual situation in which the Government attempted to negate an oral understanding or agreement reached at a bidders' conference. In rejecting defendant's argument in that case, the opinion stated:

> To hold that the writing signed following such a conference as here took place negates the oral agreement reached at the conference would be reckless of the reputation of the procurement system in which bidders' conferences are an integral part. Meetings between Government procurement officers and prospective bidders would become a sham. Questions would be useless, for answers would be without force, and the amounts of the bids received would soon show the results. Respect for the answer is required by the respect given the Government's procurement process.

Sylvania Elec. Products, Inc. v. United States, 458 F.2d 994, 1008, 198 Ct.Cl. —— (April 14, 1972).

■ Although plaintiff is entitled to recover, it is clear that it may not recover lost profits or consequential damages. The subject contract contained the standard "Termination for Convenience" clause. This principle has been well established by this court in a long line of cases beginning with John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), and culminating most recently with Albano Cleaners, Inc. v. United States, 455 F.2d 556, 197 Ct. Cl. 450 (Feb. 18, 1972). Therefore, plaintiff is entitled to recover only in accordance with the "Termination for Convenience" clause, and not as if a common law breach of contract had occurred.

Accordingly, plaintiff's motion for summary judgment is granted in part. Defendant's cross-motion for summary judgment is denied. The case is remanded to the trial commissioner for a determination of the amount of plaintiff's recovery pursuant to Rule 131(c) (2).

NICHOLS, Judge (dissenting):

This case follows hard upon International Tel. & Tel., ITT Defense Communications Division v. United States, 453 F.2d 1283, 197 Ct.Cl. 11 (1972), wherein we had to consider, as here, the contract which is annually renewable by fiscal years as appropriated funds become available. The majority held the writing then before us to have the legal incidents of an option contract though the parties had carefully avoided the use of option language. I thought the intent was that as funds became available legal rights arose, and the giving of written notice of extension was a mere ministerial function, not indispensable to the legal result. Here, however, the parties actually used option language and my qualms are not applicable.

If the statement of Mr. Scala at the pre-bid conference is read as a commitment that the contract would be extended for the first full year, it contradicts the written contract and should fail on

that ground. I read Commissioner Schwartz's scholarly discussion of the parole evidence rule, adopted by the court in Sylvania Elec. Products, Inc. v. United States, 458 F.2d 994, 198 Ct.Cl. —— (decided April 14, 1972), as allowing such evidence to explain an ambiguous statement or add additional terms, not to contradict the writing. The writing is unambiguous, in light of ITT, *supra,* that the contract may be non-extended for any reason at all, including even inadvertence and clerical error, even if funds are available. However, I read Mr. Scala as answering the question put to him, that for the first year funds were available, so bidders could feel easy about that likely hazard to the contract's continued life.

I think it overstretches Mr. Scala's remark to make it, as the court does, a commitment as to what defendant would do in the event that occurred, a protest against the award by an unsuccessful bidder, a questioning by the Comptroller General of the propriety of the award, and his recommendation that it should not be extended. I deem it a fair and proper use of the pre-bid conference that any prospective bidder who wanted to be reassured about this should have asked about it.

In John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S. Ct. 1332, 12 L.Ed.2d 295 (1964) we recognized the propriety of the Comptroller General's review of awards, and his making recommendations and rendering decisions that awards or contracts should be cancelled or withdrawn, even though they would not be held invalid in court. In such circumstances, the contract is not a nullity and the contractor is not left without a remedy, but it is logical to expect the use of the contract's own provisions to get the Government out of its deal as cheaply as the clauses will allow. In *Reiner,* the termination article was so used, but in the case of a multiple fiscal year procurement with option to extend it would be foreseeable that the Comptroller General might recommend that the contract simply not be extended. It appears to me that the plaintiff accepted the award with this hazard inherent. It certainly appears equitable to use a termination settlement as a sweetener but it seems to me contrary to the contract. The procurement community must accept the fact that there is a bid protest procedure, and it would seem equally so that sometimes it may cause someone a loss. Unless the contract provides relief, it would seem the loss must lie where it fell. I note that in the ITT case, *supra,* the contract we construed there included, besides a termination article, a more limited provision for reimbursement of some costs in cases of non-extension. If parties don't contract for this, I don't think they get it.

I add, if everything I say above is wrong, there remains a doubt whether the exculpatory clauses discussed in the court's opinion do not exculpate defendant here.

KUNZIG, Judge, joins in the foregoing dissenting opinion.